C. A. Sandquist, Appellee, v. The Fort Dodge, Des Moines & Southern Ry. Co., Appellant.

**Railroads:** crossing accident: negligence: evidence. In this action for personal injury to plaintiff while attempting to board one of defendant's cars at a crossing, the evidence is reviewed and held sufficient to take the case to the jury and to sustain a verdict for plaintiff.

*Appeal from Webster District Court.*—Hon. Charles E. Albrook, Judge.

Tuesday, March 18, 1913.

Action to recover damages for personal injuries.— *Affirmed.*

*Dyer & Dyer* and *Price & Joyce,* for appellant.

*Kenyon, Kelleher & O'Connor,* for appellee.

GAYNOR, J.—This action is brought by the plaintiff against the defendant to recover for personal injuries alleged to have been received by him at a point in Webster county, on defendant's line of road, known as Fried's Crossing. The defendant is an interurban railroad operating a line of road for the carriage of passengers and freight, between the cities of Des Moines and Ft. Dodge, run by means of electricity. That on the night of March 11, 1910, the plaintiff went to the point on said line known as Fried's Crossing, a point where the public highway crosses defendant's line of track. It was the intention of plaintiff in going there to seek passage on the south-bound car at that point to the town of Harcourt, on said line of road. The plaintiff alleges that he signaled the car to stop, by stepping into the center of the track, lighting a newspaper, and waving the same as a signal to the plaintiff that he desired to take passage on the car. That the car was about an hour and a half late, arriving at this crossing about 9:30 that evening. That upon said signal, the approaching car slowed down and was running very slowly as it approached the highway crossing on which defendant was standing, and that when it reached the said highway crossing it momentarily stopped. That thereupon plaintiff proceeded to board said car and attempted to grasp the handhold at the side of the rear platform for such purpose, and before said plaintiff was able to board said car, and while he was in the act of boarding the same, defendant, through its servant, the motorman, caused the car to be started forward with a sudden and violent jerk, and the plaintiff lost his grasp by reason thereof, and fell, sustaining injuries to his right hand, forearm and shoulder. That it was the custom and practice of the defendant to stop its cars, upon signal, at this point in order that intending passengers might board the car. The defendant denies plaintiff's claim and contends that the plaintiff did not signal the car to stop at Fried's Crossing, but that, when the car was in close proximity to the plaintiff, he was sitting on a plank east of the railroad

tracks and north of the highway crossing, and arose from his seat, raised his hand, and stepped close to the car. That it was so close—that is, the car—that the motorman was unable to stop, and the plaintiff received his injuries by the car's coming in contact with his hand and shoulder as the car passed over Fried's Crossing. That it was then moving at a rapid rate of speed. The defendant further contends that the car did not stop that night at the crossing and was not brought to a stop until it had reached a point 600 feet south of the crossing. Defendant further contends that when the plaintiff arose from his leaning posture, north of the highway, and attempted, if he did attempt, to signal the car, the car was then so near the plaintiff and running at such a rate of speed that it was impossible for the car to have been stopped in time to avoid striking the plaintiff. On the issues so tendered, the cause was tried to a jury, and a verdict rendered for the plaintiff, and from a judgment upon this verdict the defendant appeals.

The principal contention of the defendant, upon this appeal, is that the evidence submitted to the jury did not warrant the verdict; that the verdict is contrary to law, in that the facts show that the defendant was attempting to board the car while the same was moving; that his injuries were the proximate result of such unlawful attempt; that the court erred in overruling defendant's motion for a directed verdict at the close of plaintiff's testimony, and erred in overruling defendant's motion for a directed verdict at the close of all the testimony. The defendant also complains and predicates error on the giving of instructions six and eight, given by the court to the jury on its own motion, and these being the only errors complained of, if they are errors, these are the only ones to which we turn our attention.

The first question is. Was there sufficient evidence before the court at the time of the ruling on the motions for a directed verdict to take the case to the jury? To determine

this question requires an examination and a careful analysis of the testimony before the court at that time.

The plaintiff was called as a witness in his own behalf and testified substantially as follows: "I went to Fried's Crossing this night, to take the car, which I had done about fifteen times before. I signaled it to stop by means of a paper, to which I set fire with some matches I got from Fried that night. The car always stopped there every other time I signaled it. After waiting some time, I saw the car coming. It was then about fifty rods away. I stepped between the rails and set fire to the paper and signaled the car to stop. The car did not come very fast, and I went out in the road with my satchel to wait for the car. I was six or maybe ten feet away from the track on the east side, and a little to the north of the wagon road. The car stopped, but not to give me time to get on. It didn't stop long enough, and I was about to step on (I had to step up about a foot), when the car went away. I had hold of the railing. I didn't have time to catch hold, or maybe I could have held on. I cannot say whether my foot was up on the step or not. I have boarded this car at this crossing, after dark, at least four times. It was the car that struck me, I suppose, and caused me to fall." On cross-examination he said. "I left Fried's house about 7:30. The car was due there about 8 o'clock, but did not arrive until 9. I walked back and forth there waiting for the car, but did not go away from the crossing." He further testified in answer to the question: "Did the car start to move before you got on? Before you attempted to get on?" He answered: "Yes, sir. I took hold of the handle, but it went away from me. I did not get a good hold so I could hold fast. I tried to grab the back handle or the one behind the step with my right hand. I was just in front of where they stop when the car moved away from me and pulled my hand loose. The car stopped a moment, but not long enough for me to get on. It stood still a second. When the car was standing still, I rushed forward and was going to take hold, but I didn't catch

hold before the car started.'' He also answered the following question: ''You say the car started before you attempted to get on?'' ''Yes, sir.'' He answered the following question: ''How fast was it going when you attempted to get on? It went fast then, but when it came it did not go fast. When the car stopped, the rear end was to the north side of the road. The car was standing still when I reached for it to get on. It started forwards. When I took hold of the handle, the car went. It went after I took hold of the handhold. I did not not get a real hold.'' He answered the following question as follows: ''How close were you to the car before it started to move? I cannot say for sure. I was so near it I had to hold on to the railing on the back towards the north. I had a hold of the handhold and was going to step up. Then it went. It did not stop long enough so I had time to get on.''

Mr. Fried, called in behalf of the plaintiff, testified: ''I was at the crossing the morning after the accident, and I saw a part of a burnt paper right in the center of the road, about four or five feet from the track. It is customary for that car south, about 8 o'clock, to stop at the crossing on signal, either by a light at night or a hand signal in the day. I didn't pick this paper up. I saw it there. More than half of it was burned. It was a common newspaper. I think it was the same paper I gave Sandquist, but I couldn't swear that it was. I gave him the paper the evening before, a little after 7 o'clock, and supplied him with dark tipped matches.''

Charles Swenson, called for the plaintiff, says: ''I was outdoors on the evening of March 11th. The car was due at 8 o'clock, but was about an hour late. I live about thirty rods from Fried's Crossing. The wagon road is east and west, and the railroad north and south. I was in my yard, east of my hoghouse, which is about ten rods from the wagon road. There was a hoghouse between me and the railroad crossing, and about halfway between the track and my house. The car at the time I saw it, went over the crossing a little faster than a man could walk. It might have been four miles an hour. I

do not think it stopped at the crossing at all that night. That is, not that I could see. The hoghouse is so situated that I could not see very well whether it stopped or not. It didn't seem to me that it stopped there at all. You can see the car when it comes to the hoghouse, and you can see it again when it passes. It was going about four miles an hour when I saw it, after it passed the hoghouse."

The motorman in charge of the car was called in behalf of the defendant and testified that he reached Fried's Crossing about 9:15. "I did not notice whether any signal to stop was given at that crossing. I approached the crossing about thirty-five or forty miles an hour. I got a glimpse of a man there about the time I was right on the crossing. I got a glimpse of him when I was two hundred and fifty feet north of the crossing. He was just getting out of a stooping position, and as soon as I saw him I whistled two or three times. I made no attempt to stop. There was no signal given to stop. He was coming right towards the car. I was afraid he was too close to the car, and, if I had stopped, he would have been in front of the car. He had his hand stretched out in front of the car. We ran fifty or sixty feet past the crossing before we stopped. My car weighed about thirty-five tons, and going at the rate of about thirty-five or forty miles an hour, so that I could not stop in less than five hundred feet. I heard the car hit his hand as it flashed by. It is impossible to start one of these cars with a jerk. We were late that night and were trying to make up time, and we stopped as little as possible for letting off or taking on passengers."

A. F. Patten, a passenger on the car that night, was also called and testified: "My attention was first called to the fact that we had passed Fried's Crossing when we were right at the crossing, as there was something out of the way happened. You could tell in the car, either that something had hit the car, or the air had been turned on suddenly, or something. I don't know what it was." But he also testified that the car did not stop at this crossing.

This is practically all the evidence in the cause having any probative force upon the issues tendered. There is a square conflict, between the motorman in charge of the car and the plaintiff, as to whether the plaintiff signaled the car, and as to whether or not the car stopped at Fried's Crossing. It is true that the plaintiff, in answer to some questions, said that the car was moving when he attempted to get on the car, but it is apparent, from the whole record, that these questions were not understood by the witness at the time he gave his answers. It appears that he was examined through an interpreter, did not understand the English language well, and the questions were so framed that it is apparent that he did not understand the full meaning and import of the word "attempted" as used by counsel in his questions. Apparently the dominant thing in his mind was that the car started as he was getting on; that it started while he was in the act of getting on: that it started while he was attempting to board the car. The motorman's reason for assuming that the injury to the plaintiff was due to his being struck by the car, as it passed over Fried's Crossing, does not appeal to us as being reasonable. He says he heard the car strike defendant's outstretched hand as it passed. This would seem to be rather incredible. These cars in their movements make a good deal of noise. The car weighed thirty-five tons, and, as he says, was moving at the rate of thirty-five miles an hour. That the impact of the car with defendant's hand, or even with his whole body, would make a perceptible impression upon the car, so as to be discoverable by any one in or on the car, seems quite improbable.

The passenger in the car, who gave testimony, conceded that he was occupied with other matters; was giving no attention to the movements of the car, but noticed something unusual at Fried's Crossing. This could not have been the impact of the car with defendant's outstretched hand. The motorman testifies that he did not attempt to stop the car until after it had passed Fried's Crossing. There must then have

been something else that attracted this witness' attention at this crossing (assuming that his attention was attracted there by something), and we are inclined to think, from the whole record, that it was due to the sudden stopping and starting of the car as claimed by the plaintiff. At least, the jury might have well so found, and it is not the province of this court to weigh the evidence or sit in judgment upon the credibility of the witnesses, and we find no reason for disturbing this verdict on the ground that the court erred in passing the case to the jury for its judgment.

We find no error in the instructions complained of, and the case is therefore *Affirmed.*